Tate v. Field.

JOSEPH TATE

v.

FRANK S. FIELD et al.

[Decided April 27th, 1898.  Filed January 4th, 1899.]

1. The purchaser of the equity of redemption is charged with notice of a covenant of the mortgagor to erect on the premises a building; and when he removes such building, it being of a permanent character, and affixed for use with the realty, he is presumed to have done so as a willful wrongdoer, and will not be permitted to profit thereby.

2. A tenant who, as a willful wrongdoer, commits waste by removing a building, and fails to show the actual proceeds derived therefrom, is chargeable to the highest probable or speculative value of such building to the reversioner reasonably warranted by the evidence, together with interest from the commission of the waste.

On hearing to take an account of waste.

*Mr. Samuel J. MacDonald,* for the complainant.

*Mr. Francis J. Swayze,* for the defendants.

PITNEY, V. C.

This is a bill to foreclose, with an allegation of waste by the defendants, who are the owners of the equity of redemption by purchase from the receiver of the mortgagor, an insolvent corporation.  In addition to the prayer for foreclosure and sale, there is a prayer for compensation for waste committed.

There was a decree of foreclosure and sale, with a declaration that the complainant was entitled to compensation for the waste, as reported in *Tate* v. *Field, 11 Dick. Ch. Rep. 35.*

The sale was made, and the premises brought a less sum than the amount of the decree, leaving a deficiency of $694.24, as of July 12th, 1897.  The case was then again brought to hearing for the purpose of ascertaining what sum the defendants should pay by reason of the waste.

The building removed by the defendants was a long, wide, one-story frame shed, thirty by one hundred and fifty feet, adapted for use in storing material for manufacturing paper felt, and for storing the manufactured article. It was used in connection with a factory near by, then carried on by the original mortgagor, and was of very little use for any other purpose. After the factory ceased to be operated, there was no demand for any such building in the neighborhood, and its value as a building upon the premises was slight. Its principal value was in the materials—sawed lumber—of which it was composed. Those materials cost, before being placed in the building, $720, as shown by the evidence of the contractor who erected the building. They were, of course, somewhat depreciated in value by being cut to fit that building, and had stood in the building some two or three years, but had depreciated by reason of age very slightly, if any. The principal value of the lumber was for use in some other building, and such value was uncertain. The evidence indicated that it would depend almost entirely upon the circumstance that a contractor or other person desiring to erect a building or series of buildings might have an opportunity to use the lumber to good advantage for such purpose. The witness for the defendants estimated the value for that purpose at about $100 to $150. The witness for the complainant, who erected the building and testified to the cost of the material, and who I am satisfied is a gentleman of experience and of good judgment, testified that under favorable circumstances the materials might be worth to a builder or contractor more than one-half the original cost, viz., $360 or upwards.

The allegation of the bill is that the defendants moved the building from Chatham, where the mortgaged premises are, to premises of the defendants, Field, Haines and White, near Boonton, in the county of Morris, and "re-erected the building thereupon." This allegation was not denied by the answer and must be taken to be an admitted fact in the case.

The defendants gave no evidence and rendered no account as to what disposition they made of the materials in the building, or as to what practical value they proved to be to them.

The fact set out in the bill that the defendants purchased the premises from the receiver appointed by this court, and that they removed the building and "re-erected it on their own premises," leads naturally to the inference that they had occasion to use the same or a similar building, and hence that they derived from the materials in question the maximum of benefit; that is, they derived as much or more benefit from them than any other person could have done.

Upon these facts the question arises, what rule is to be adopted in fixing the amount for which the defendants are to be charged, and that depends, in a measure at least, on the attitude of the defendants as either willful wrongdoers or innocent trespassers.

The defendant Field, in his answer, alleged :

"And this defendant, Frank S. Field, for himself answering, says that he was present at the removal of the said building, and supposed at the time that he had a perfect right to remove the same, and still insists that the building was rightly removed."

No proof was offered at any time in favor of that proposition, or any reason, with the least degree of plausibility, upon which he could have based the supposition that the defendants had such right. It was, indeed, placed upon wooden posts, instead of stone pillars, fixed in the earth ; but it was a large building and of a permanent character, built for use upon those premises, and, moreover, it was placed there in pursuance of a covenant in the mortgage that the mortgagor would place a building there of a certain value. The defendants are chargeable with notice of the covenant to that effect, and I must therefore hold them responsible as willful wrongdoers.

That being so, the familiar and well-settled rule in equity applies that a wrongdoer shall not be permitted to take any advantage of, or make any gain from, his wrongdoing. That rule has been applied frequently in similar cases. It was applied in the case of *Duke of Leeds* v. *Earl of Amherst, 14 Sim. 357; 2 Phil. 117; 20 Beav. 239.* There the Duke of Leeds filed a bill to recover the proceeds of the destruction of Kiveton House, a family mansion, the materials of which were sold and the pro-

ceeds received by the late duke, his father, in his lifetime, and it was held that he was entitled to an account. Afterward an accounting was had before a master, who made a report, finding a large sum of money—£42,000—due from the estate of the late duke to the present duke. Exceptions to that report came on for hearing before Sir Lancelot Shadwell, master of the rolls, in 1850, and is reported out of place by Mr. Beavan in the twentieth volume of his reports, page 239. Owing to the great length of time which had elapsed since the waste was committed and the fact that no separate account of the proceeds had been kept by the late duke, it was impossible for the master to resort to any reliable data to make up an account, and the amount as found was the result, in a great measure, of conjecture. On that subject Sir Lancelot Shadwell (at *p. 242*) said : " I take it that the general wisdom of mankind has acquiesced in this—that the author of a mischief is not the party who is to complain of the result of it, but that he who has done it must submit to have the effects of it recoil upon himself." He then goes into an elaborate examination of the law upon the subject, repeating (at *p. 246*) what he had previously stated as the rule ; and he sustained the master's report on the ground, in substance, that it was the duty of the master to make it large enough to cover the possible profits which the late duke has made from the sale of the materials of the house, the profits actually realized being the basis upon which the original reference had been granted, as appears by an examination of the reports in *14 Sim.* and *2 Phil. Ch.*

The same rule was laid down by Sir John Romilly, master of the rolls, in *Lushington* v. *Boldero, 15 Beav. 1.* There a party, tenant for life, without impeachment of waste, committed what is called " equitable waste " by cutting down ornamental timber, and the court compelled him to pay into court the amount for which the timber was sold, and that amount having been in court some time, the question arose as to whether or not the tenant for life who committed the waste was entitled to the interest upon it, or whether that interest should accumulate for the benefit of the reversioner, and the master of the rolls (at *p. 5*)

Tate v. Field.

says: "The equitable doctrine applicable to this and other similar cases is this, that no person shall obtain any advantage by his own wrong." And again (at *p. 7*): "When, however, the tenant for life has committed the wrongful act which produces the fund, the court will not allow him to gain any benefit from it; but the reversioner takes the benefit arising from an accretion of the fund, in lieu of the accretion of the timber." And he gave the interest to the reversioner instead of to the tenant for life.

The same doctrine was again asserted by Lord Romilly, in *Bagot* v. *Bagot, 9 Jur. (N. S.) 1022*. That was a case of both timber and minerals, and (at *p. 1024*) the master of the rolls reiterated the doctrine that a tenant for life could not derive any benefit from timber cut by him knowingly and willfully, and says that, " reviewing the authorities, I still retain that opinion." The question was whether the tenant for life was entitled to interest on the proceeds of timber and minerals improperly cut and won, and it was held that he was chargeable with interest, and was not entitled to the use of it during his lifetime.

In the case of *Morris* v. *Morris, 3 De G. & J. 323*, Lord-Justice Knight Bruce, in delivering judgment, said: "If it had been shown, or were in any degree likely, that any part of the materials of the old house had been sold, probably, notwithstanding the much larger expenditure on the construction of the new mansion-house, the assets of the second baronet would have been held liable to account." And Lord-Justice Turner (at *p. 328*) said: "The principle upon which the court proceeds in these cases is that the tenant for life of an estate is liable to account in equity for *profit* derived by him from an improper user of his legal powers, in committing equitable waste."

In *Seagram* v. *Knight, L. R. 2 Ch. App. Cas. 628 (1866)*, the head-note is this: "If a tenant for life, impeachable for waste, cuts timber without the leave of the court, he will never be permitted to derive any advantage from his wrongful act." And Lord Chelmsford (at *p. 632*) says: "But whatever may be the course adopted by the court where a tenant for life, impeachable for waste, obtains its leave to cut down timber, I entertain no

doubt that if he takes upon himself to cut and sell timber without authority, he does it at his peril, and he can never be permitted to derive any advantage from his wrongful act," referring to *Williams* v. *Duke of Bolton, 3 P. Wms. 268, note.*

And in the much-discussed and thoroughly-considered case of *Jegon* v. *Vivian, L. R. 6 Ch. App. Cas. 742 (1871),* the same doctrine is announced. Lord Hatherley, in delivering judgment (at *p. 761*) says: "This court never allows a man to make profit by a wrong." The question there was whether coal wrongfully but innocently taken should be charged for at the value *in situ,* or at the value after it had been separated, "won" or "hewn," as it is called, and he held in that case that what is called "the milder rule" should be applied. The more severe rule, as is well known, was laid down in *Martin* v. *Porter, 5 M. & W. 351,* and is still the law in England in all cases except where there was no intentional wrongdoing. *Phillips* v. *Homfray, L. R. 6 Ch. App. Cas. 770; Llynvi Coal Co.* v. *Brogden, L. R. 11 Eq. 188.*

The case of *Duke of Leeds* v. *Lord Amherst, supra,* is the only one which I can find at all parallel to the present one in respect to the uncertainty and speculative character of the value of the materials taken and the profits derived. And in this case the defendants are responsible for that uncertainty, because it was in their power to show what profit they actually derived. Not having done so, they are justly subjected to the rule that all presumptions are against the wrongdoer.

Most of the English cases arose from the cutting of timber and the removal of minerals, and they generally present a very easy mode of ascertaining the actual profit derived by the wrongdoer. In the case of either timber or coal there is a well-known market value, and deducting from that the cost of removing it from the stump or the mine.leaves the value of the timber standing in the ground, and the ore *in situ;* and the well-settled rule, as we have seen, is not to allow the wrongdoer the cost of cutting down the timber or of hewing or breaking loose the ore or mineral, but to ascertain its value in the manner just stated after the timber has been cut down and the mineral loosened from its

Tate *v.* Field.

site, the rule being not to give the owner of the mineral or timber any benefit from the skill or labor bestowed upon it by the wrongdoer except the cost of separation.

This was the principle adopted in the case of *Whorton* v. *Webster, 56 Wis. 356,* cited by counsel for defendants. That was a case of cutting timber, between mortgagee and mortgagor, and the timber was capable of an exact valuation on the stump. The principle of the decision is contained in these words : " He [the mortgagee] cannot, in this proceeding, appropriate the labor and skill of the Whartons [the wrongdoers] to the payment of his mortgage."

The principle contended for by the defendants is that the complainant is entitled to recover only the actual depreciation in the value of the premises by the removal of the building, and that is shown by the evidence to be trifling.

But I am unable to give my approval to such a doctrine. It would lead to this—that a man might have on his premises some fixture or object—building, or rock, or tree—which was of no kind of value to him, but which could be sold by his neighbor for a particular purpose and made very valuable, and that the neighbor might commit a trespass, go upon the premises, remove the object and make a large gain out of it by paying nominal damages to the owner.

In the case in hand the mortgagor was entitled to the benefit of every chance that the building on the mortgaged premises might be, some time in the future, of great value. The original cost was $1,106, besides the painting, a matter of $40 or $50, and the tarred-paper roof probably as much more, amounting in all to nearly or quite $1,200. The owner of the building thought it worth while to spend that amount of money upon it. If the factory in the neighborhood should ever again be operated the building might again be valuable, or the owner had a right to enjoy his opportunity to sell the materials to some person, who, some day in the future, might possibly need them. He has been deprived of the benefit of these chances, and the defendants are chargeable, under the circumstances, with having derived a large benefit from their wrong. And for these reasons, in the

absence of any evidence on their part as to what benefit they actually did derive from the building, I think that they must be charged with the highest value which the proofs will reasonably warrant, not exceeding, of course, the amount of the deficiency.

The proofs taken at the first hearing show that the building was removed about the 1st of December, 1894 (the complainant was a non-resident, and had no notice of it until some time afterwards); and I think that I am safe in adjudging that the materials were worth to the defendants at least $400, and that they should be charged with interest on that amount from the 1st of December, 1894, or say $80, making a total of $480.

I will advise a decree that the defendants are jointly and severally liable to pay, and do pay forthwith to the complainant, the sum of $480, together with the costs of this suit.